**Slip Op. 24-42**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

|  |  |
|---|---|
| BLUE SKY THE COLOR OF IMAGINATION, LLC, | |
| Plaintiff, | |
| v. | Before: Jane A. Restani, Judge |
| | Court No. 21-00624 |
| UNITED STATES, | |
| Defendant. | |

<u>**OPINION**</u>

[In a Customs classification matter, judgment issued declaring classification other than as claimed by the parties.]

Dated: April 10, 2024

<u>Christopher J. Duncan</u> and <u>Elon A. Pollack</u>, Stein Shostak Shostak Pollack & O'Hara, LLP, of Los Angeles, CA, argued for the plaintiff, Blue Sky the Color of Imagination, LLC.

<u>Monica P. Triana</u>, International Trade Field Office, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of New York, NY argued for the defendant.  With her on the brief were <u>Brian M. Boynton</u>, Principal Deputy Assistant Attorney General, <u>Patricia M. McCarthy</u>, Director, <u>Justin R. Miller</u>, Attorney-In-Charge, and <u>Aimee Lee</u>, Assistant Director.  Of counsel on the brief was <u>Fariha B. Kabir</u>, Office of Assistant Chief Counsel, International Trade Litigation, U.S. Customs and Border Protection of New York, NY.

Restani, Judge: Before the court are cross-motions for summary judgment.  Pl.'s Mot. for

Summ. J., ECF No. 20 (Aug. 23, 2023) ("Blue Sky MSJ"); Def.'s Mem. in Supp. of Cross-Mot.

for Summ. J. and Opp'n to Pl.'s Mot. for Summ. J., ECF No. 25 (Nov. 17, 2023) ("Gov. MSJ").

Plaintiff Blue Sky the Color of Imagination, LLC ("Blue Sky") challenges the United States

Customs and Border Protection's ("Customs") classification of certain paper products under

subheading 4820.10.40.00 of the Harmonized Tariff Schedule of the United States ("HTSUS").

At issue, as framed by the parties, is whether certain notebooks containing calendars are classified

instead as calendars of any kind or "[o]ther" paper products for tariff purposes.  See Blue Sky MSJ

at 3.  The United States ("Government") asks that the court sustain Customs' classification.  Gov.

MSJ at 15.  For the reasons laid out below, the court concludes that neither classification is correct,

and the paper products are diaries classified in subheading 4820.10.20.10, HTSUS.

## I.    **Background**

### A.  Procedural Background

There are no material factual disputes in this case.  Gov. MSJ at 15; Blue Sky MSJ at 22.

On December 2, 2021, Blue Sky imported ten models of desk calendars and planners and, upon

import, classified all ten models of desk calendars and planners as "[c]alendars of any kind" under

heading 4910, HTSUS.  Blue Sky MSJ at 6.  At liquidation, Customs reclassified all ten models

of desk calendars and planners as "[o]ther" under subheading 4820.10.40.00, HTSUS.  Blue Sky

MSJ at Ex. 4.  Blue Sky timely protested Customs' reclassification.  Id.  Customs denied Blue

Sky's protest, and Blue Sky brought this case before the court.  Blue Sky MSJ at 7, Ex. 4.  Since

this case was initiated, Customs has settled with Blue Sky as to several models of the subject

merchandise; the sole remaining issue before this court is the classification of four models of Blue

Sky weekly/monthly planners.  Blue Sky MSJ at 4.

### B.  Description of Subject Merchandise

The subject merchandise consists of four paper products that have variously been called

"planners" and "planning calendars" by the parties.  Gov. MSJ at 3; Blue Sky MSJ at 3.  The

subject merchandise consists of four different "weekly/monthly" models.  Gov. MSJ at 3; Blue

Sky MSJ at 3.  Although the sizes vary among the models, all four models include full page month

calendars followed by weekly sections that include space to write notes.  Gov. MSJ at Ex. A; Blue

Sky Reply to Gov. Mot. for Summ. J. at 8–9, ECF No. 26 (Dec. 22, 2023).  The subject

merchandise has the term "planner" on the front.  Gov. MSJ at Ex. F; Blue Sky MSJ at Ex. 8.2.

The subject merchandise is "used to note future appointments."  Blue Sky MSJ at 13; see Gov.

MSJ at 27.  They are spiral bound as notebooks are and contain a few additional pages for addresses

and phone numbers.  Gov. MSJ at Ex. A; Blue Sky MSJ at Ex. 13.

## II.    Jurisdiction and Standard of Review

The court has jurisdiction under 28 U.S.C. § 1581(a).  The court will grant summary

judgment if "there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law."  USCIT R. 56(a).  Summary judgment is appropriate in tariff

classification cases where "there is no genuine dispute as to the nature of the merchandise and the

classification turns on the proper meaning and scope of the relevant tariff provisions."  Deckers

Outdoor Corp. v. United States, 714 F.3d 1363, 1371 (Fed. Cir. 2013) (citation omitted).  The court

decides classification de novo.  See 28 U.S.C. § 2640(a)(1) (2018); Telebrands Corp. v. United

States, 36 CIT 1231, 1234, 865 F. Supp. 2d 1277, 1279–80 (2012).

## III.    Discussion

### A.  Legal Framework

The meaning of a tariff term is a question of law, and whether subject merchandise falls

under any given tariff term is a question of fact.  See Wilton Indus. v. United States, 741 F.3d

1263, 1265–66 (Fed. Cir. 2013) (citations omitted).  The plaintiff has the burden of establishing

that the government's classification of the subject merchandise was incorrect but does not bear the

burden of establishing the correct classification; instead, it is the court's independent duty to arrive

at "the correct result, by whatever procedure is best suited to the case at hand."  Jarvis Clark Co.

v. United States, 733 F.2d 873, 878 (Fed. Cir. 1984).  In making this determination, the court "must

consider whether the government's classification is correct, both independently and in comparison

with the importer's alternative."  Id.

       In order to determine the meaning of and apply a tariff term to the facts at hand, the court

relies on the General Rules of Interpretation ("GRIs") and, if applicable, the Additional U.S. Rules

of Interpretation.  Wilton, 741 F.3d at 1266.  The court applies the GRIs in numerical order, and

only proceeds to each subsequent GRI if a previous GRI alone cannot classify the goods.  Id.  The

first GRI, GRI 1, requires classification to "be determined according to the terms of the headings

and any relative section or chapter notes . . . ."  GRI 1, HTSUS.  HTSUS chapter and section notes

are considered binding statutory law.  See BenQ Am. Corp. v. United States, 646 F.3d 1371, 1376

(Fed. Cir. 2011).

       Tariff terms are generally adopted from the Harmonized System ("HS"), an international

product nomenclature that the U.S. implements as the HTSUS.  See Marubeni Am. Corp. v. United

States, 35 F.3d 530, 532–33 (Fed. Cir. 1994) (describing the adoption of the HTSUS system).  The

HS is the product of a treaty, the International Convention on the Harmonized Commodity

Description and Coding System ("the Convention"), which the U.S. acceded to in 1989.[1]  When

adopting the HS, the United States agreed to adopt the same tariff language as the other negotiating

parties up to the six-digit coding level.  Carl Zeiss, Inc. v. United States, 195 F.3d 1375, 1378 n.1

(Fed. Cir. 1999).  The Convention is not a self-executing treaty; this agreement is implemented

---

[1] See U.S. Dep't of State, Treaties in Force, A List of Treaties and Other International Agreements
of the United States in Force on January 1, 2020, https://www.state.gov/wp-content
/uploads/2020/08/TIF-2020-Full-website-view.pdf (last visited Mar. 21, 2024); International
Convention on the Harmonized Commodity Description and Coding System, signed June 14,
1983, amended June 24, 1986, https://www.wcoomd.org/-/media/wco/public/global/pdf/topics/
nomenclature/instruments-and-tools/hs-convention/hs-convention_en.pdf?la=en (last visited Apr.
4, 2024).

into U.S. law by Congressional statute.[2]  See 19 U.S.C. § 3004 (1988) (implementing the HS into U.S. law).

The United States adopted the HS and implemented it as the HTSUS to achieve "harmonization" of the tariff schedule; the intent was "to implement in United States law the nomenclature established internationally by the Convention."  19 U.S.C. § 3001 (1988); see also Value Vinyls, Inc. v. United States, 568 F.3d 1374, 1378–1379 (Fed. Cir. 2009) (quoting H. R. Rep. No. 100–576, at 548 (1988) (Conf. Rep.), reprinted in 1988 U.S.C.C.A.N. 1547, 1581); Marubeni Am. Corp., 35 F.3d at 532.  The HTSUS "provides a common core language for trade." Marubeni Am. Corp., 35 F.3d at 533.  In implementing the HS into U.S. law, Congress expressly stated that its purpose was "to implement in United States law the nomenclature established internationally by the Convention."  19 U.S.C. § 3001.  Thus, wherever no evidence exists to suggest a Congressional intent to alter the meaning of the HS terms when issuing the HTSUS, courts will presume that Congress intended to implement the unchanged international nomenclature utilized by the HS into U.S. law.[3]

---

[2] Self-executing treaties become part of the law of the land through U.S. ratification; non self-executing treaties are implemented by the legislature.  See Foster v. Neilson, 27 U.S. 253, 254, 314 (1829), overruled on other grounds by United States v. Percheman, 32 U.S. 51 (1833) ("Our constitution declares a treaty to be the law of the land. . . . But when the terms of the stipulation import a contract, when either of the parties engages to perform a particular act, the treaty addresses itself to the political, not the judicial department; and the legislature must execute the contract before it can become a rule for the Court.").

[3] Congress can and has varied from the language of the HS when it deems it necessary to do so; in the absence of evidence of an intent to vary from the HS language, it is reasonable to infer that the stated Congressional intent to implement the "nomenclature of the Convention" governs the meaning of the HTSUS.  For an example of language that could have been varied from but clearly was not, see heading 8204, HTSUS ("Hand-operated spanners and wrenches") implementing HS 82.04 ("Hand-operated spanners and wrenches").  HTSUS 8204 (2024); HS 82.04 (2022).  In contrast, see HS 87.05 where "breakdown lorries, crane lorries, fire fighting vehicles, concrete mixer lorries, road sweeper lorries, spraying lorries" became "wreckers, mobile cranes, fire fighting vehicles, concrete mixers, road sweepers, spraying vehicles," in heading 8705, HTSUS.  See HS 87.05 (2022); HTSUS 8705 (2024).

When "a tariff term is not defined in either the HTSUS or its legislative history, the term's correct meaning is its common or dictionary meaning in the absence of evidence to the contrary." Russell Stadelman & Co. v. United States, 242 F.3d 1044, 1048 (Fed. Cir. 2001) (citations omitted). In construing tariff terms, the court may "consult lexicographic and scientific authorities, dictionaries, and other reliable information" or may rely on its "own understanding of the terms used." Baxter Healthcare Corp. v. United States, 182 F.3d 1333, 1337–38 (Fed. Cir. 1999) (citation omitted). Courts will also look to the Explanatory Notes ("ENs") to the Harmonized Commodity Description and Coding System for guidance in interpreting the HTSUS terms. Carl Zeiss, Inc., 195 F.3d at 1378 n.1. The ENs are not dispositive evidence of the meaning of the tariff terms,[4] but the ENs are "generally indicative of [the] proper interpretation of the various provisions" and so are persuasive evidence of the international meaning of the tariff terms.[5] Carl

---

[4] When it implemented the HS into U.S. law, Congress was mindful that the ENs, unlike the HS, were not part of the terms of the Convention's agreement and thus the ENs were not binding on the United States in the same way that the agreement to adopt the HS nomenclature was. See H. R. Rep. No. 100–576, at 549 (1988) (Conf. Rep.), reprinted in 1988 U.S.C.C.A.N. 1547, 1582 ("Although generally indicative of proper interpretation of the various provisions of the Convention, the Explanatory Notes, like other similar publications of the Council, are not legally binding on contracting parties to the Convention. Thus, while they should be consulted for guidance, the Explanatory Notes should not be treated as dispositive."). Nonetheless, Congress was also mindful that the ENs represent useful elaboration on the international meaning of the tariff terms, which the United States had agreed to adopt and which Congress has explicitly stated that it was its intent to implement into U.S. law. See id.; see also 19 U.S.C. § 3001. Thus, absent evidence of a specific Congressional intent to adopt a meaning contrary to the ENs, the ENs are persuasive evidence of what the tariff terms may mean on an international level, and are persuasive evidence of the meaning of the language adopted by Congress.

[5] Congress may diverge from the international meaning; regardless of U.S. treaty obligations, Congress always retains the right to adopt whatever laws it thinks are "necessary and proper." U.S. Const. art. I, § 8, cl. 18; see also Medellin v. Texas, 552 U.S. 491, 509 n.5 (2008) ("Whether or not the United States 'undertakes' to comply with a treaty says nothing about what laws it may enact. The United States is always 'at liberty to make . . . such laws as [it] think[s] proper.'"). In this case, evidence before the court indicates that, with this particular treaty, the overall Congressional intent was to adhere to the meaning of the international nomenclature in U.S. law. This may not be the case in all instances of U.S. implementation of self-executing treaties, and

Zeiss, Inc., 195 F.3d at 1378 n.1; see also BenQ Am. Corp., 646 F.3d at 1376; H.R. Rep. No. 100-576, 549, reprinted in 1988 U.S.C.C.A.N. 1547, 1582.

English is spoken in both the United Kingdom and in the United States of America, but there are some linguistic distinctions among the dialects spoken by the two countries.  See, e.g., Victoria's Secret Direct, LLC v. United States, 37 CIT 573, 585–86, 908 F. Supp. 2d 1332, 1345 (2013); Jing Mei Auto. (USA) v. United States, Slip Op. 23-180, 2023 WL 9792953, at *12 (CIT Dec. 18, 2023).  Because the court aims to understand what a tariff term would mean within context of its origin as part of the "international nomenclature" for trade, the court presumes that HS terms that are implemented into the HTSUS without any alteration may encompass both the British and American definitions of the term.  See, e.g., Victoria's Secret, 37 CIT at 585–86, 908 F. Supp. 2d at 1345; Jing Mei Auto., 2023 WL 9792953, at *12.  When Congress wishes to exclude a British definition or otherwise alter the HTSUS, it can change the HS language or otherwise adopt an Additional U.S. Rule of Interpretation ("ARI").  Lerner New York, Inc. v. United States, 37 CIT 604, 617, 908 F. Supp. 2d 1313, 1326 (2013) (noting availability of Additional U.S. Rules of Interpretation and assessing an instance in which Congress had replaced the British "vest" with the American "tank top").  In the absence of a specific, American change, the court aims to identify what the tariff term would mean if used as part of the "common core language for trade" and where appropriate consider the British definition of the term.[6]

---

when interpreting a statute that implements a treaty the court must always examine Congressional guidance prior to looking to the international document for the meaning of a U.S. statute.

[6] The HS was developed through the Customs Co-Operation Council ("the Council").  See Marubeni Am. Corp., 35 F.3d at 533.  The Council was established by treaty in 1952.  See Convention Establishing a Customs Co-Operation Council, signed Dec. 15, 1950, https://www.wcoomd.org/-/media/wco/public/global/pdf/about-us/legal-instruments/conventions-and-agreements/ccc/convccc.pdf?la=en (last visited Mar. 29, 2024) (entered into force Nov. 4, 1952).  The United Kingdom was a contracting party at the time of the

In addition to its English version, the Convention was also drafted in French; the French and English texts are considered equally authoritative treaty texts.[7]  In both treaty versions, parties agree to adopt the international nomenclature of the Convention; where the English text indicates that the parties undertake to adopt the language of the HS, the French text indicates that the parties will adopt the language of the "Système harmonisé" or "SH."[8]  Accordingly, the HS is also issued in French,[9] and the French SH, like the English HS, implements the nomenclature of the

_____

Council's origin; the United States did not ratify or accede to the Council until 1970.  See World Customs Org., Position as Regards Ratifications and Accessions, https://www.wcoomd.org/-/media/wco/public/global/pdf/about-us/legal-instruments/conventions-and-agreements/conventions/sg0228ea.pdf?la=en (last updated June 30, 2023).  The original Convention on Nomenclature signed in 1950 was issued in English and French, with both texts equally authoritative, and the English version contains British spellings.  See Convention on Nomenclature for the Classification of Goods in Customs Tariffs, signed Dec. 15, 1950, https://www.wcoomd.org/-/media/wco/public/global/pdf/about-us/legal-instruments/conventions-and-agreements/conventions/nom_conv_bil.pdf?la=en (last visited Mar. 29, 2024); Appendix to the Convention on Nomenclature for the Classification of Goods in Customs Tariffs § VI, signed Dec. 15, 1950, https://www.wcoomd.org/-/media/wco/public/global/pdf/about-us/legal-instruments/conventions-and-agreements/conventions/nom_conv_bil.pdf?la=en (last visited Mar. 29, 2024) ("colour").  British spelling persists in the 2022 HS Nomenclature.  See generally HS Nomenclature 2022 edition, Chapter 32, https://www.wcoomd.org/en/topics/nomenclature/instrument-and-tools/hs-nomenclature-2022-edition/hs-nomenclature-2022-edition.aspx (last visited Mar. 29, 2024) ("colouring").  The court therefore presumes that these terms are authored in British English at the international level and, if unchanged from that original language, the British English terms are adopted by Congress.

[7] See the Convention, Art. 20, ("Done at Brussels on the 14th day of June 1983 in the English and French languages, both texts being equally authentic . . . ."); see also Convention Internationale sur le Système Harmonisé de Désignation et de Codification des Marchandises, Art. 20, signed June 14, 1983; amended June 24, 1986, ("the Convention (French Edition)"), https://www.wcoomd.org/-/media/wco/public/fr/pdf/topics/nomenclature/instruments-and-tools/hs-convention/hs-convention_fr.pdf?la=fr (last visited Mar. 27, 2024) ("Fait à Bruxelles, le 14 juin 1983 en langues française et anglaise, les deux textes faisant également foi . . . .").

[8] See the Convention (French Edition), Art. 3 ("[S]es nomenclatures tarifaire et statistiques soient conformes au Système harmonisé . . . .") (emphasis added); see also the Convention, Art. 3 ("Each Contracting Party undertakes . . . [that] its Customs tariff and statistical nomenclatures shall be in conformity with the Harmonized System. . . . [I]t shall use all the headings and subheadings of the Harmonized System without addition or modification . . . .").

[9] See, e.g., Organisation Mondiale des Douanes, Nomenclature du SH Édition 2022, https://www.wcoomd.org/fr/topics/nomenclature/instrument-and-tools/hs-nomenclature-2022-edition.aspx (last visited Mar. 22, 2024).

Convention that the parties have agreed to adopt.[10]  Where treaty provisions are drafted in two different languages, if the two drafts can be read to agree, "that construction which establishes this conformity ought to prevail."  United States v. Percheman, 32 U.S. 51, 52 (1833).

      B.  Competing Tariff Provisions

Customs classified the paper items at issue here under subheading 4820.10.40.00, HTSUS, which reads:

| Heading 4820 | Registers, account books, notebooks, order books, receipt books, letter pads, memorandum pads, diaries and similar articles, exercise books, blotting pads, binders (looseleaf or other), folders, file covers, manifold business forms, interleaved carbon sets and other articles of stationery, of paper or paperboard; albums for samples or for collections and book covers (including cover boards and book jackets) of paper or paperboard: |
| --- | --- |
| 4820.10 | Registers, account books, notebooks, order books, receipt books, letter pads, memorandum pads, diaries and similar articles:[11] |
| 4820.10.20 | Diaries, notebooks and address books, bound; memorandum pads, letter pads and similar articles |
| 4820.10.20.10 | Diaries and address books |
| 4820.10.40.00 | Other |

---

[10] See the Convention (French Edition), Art. 3 ("[S]es nomenclatures tarifaire et statistiques soient conformes au Système harmonisé . . . .") (emphasis added); see also the Convention, Art. 3 ("Each Contracting Party undertakes . . . [that] its Customs tariff and statistical nomenclatures shall be in conformity with the Harmonized System . . . .") (emphasis added).

[11] In French, this section reads "Registres, livres comptables, carnets (de notes, de commandes, de quittances), blocs-mémorandums, blocs de papier à lettres, agendas et ouvrages similaires."  See Organisation Mondiale des Douanes, Nomenclature du SH Édition 2017, 48.20, https://www.wcoomd.org/-/media/wco/public/fr/pdf/topics/nomenclature/instruments-and-tools/hs-nomenclature-2017/2017/1048_2017f.pdf?la=fr (last visited Apr. 4, 2024).

Blue Sky argues that the paper merchandise is better classified under subheading 4910.00.20.00, HTSUS, which reads:

| Heading 4910 | Calendars of any kind, printed, including calendar blocks:[12] |
| | Printed on paper or paperboard in whole or in part by a lithographic process: |
| 4910.00.20.00 | Not over 0.51 mm in thickness |
| 4910.00.40.00 | Over 0.51 mm in thickness |
| 4910.00.60.00 | Other |

Both of these provisions classify items which are normally imported duty free, but Customs' classification falls under 9903.88.03, HTSUS which provides a duty rate of 25 percent ad valorem pursuant to Section 301 of the Trade Act of 1974 (codified as amended at 19 U.S.C. § 2411). Gov. MSJ at 2. If the subject merchandise is classified under subheading 4910.00.20.00, HTSUS, however, it is not subject to the additional Section 301 duty. Id.

    C. Argument

Blue Sky argues that the merchandise in this case was incorrectly classified as "[o]ther" paper products when it should in fact be classified as calendars. Blue Sky MSJ at 3. Blue Sky argues that this classification is appropriate because the calendar provision is an eo nomine provision that the product by definition meets. Blue Sky MSJ at 16–18. Blue Sky further argues that because there is no ambiguity in the HTSUS provision, the ENs should not be reached in this case because they conflict with the HTSUS's unambiguous language. Blue Sky MSJ at 18–20. The Government argues that the subject merchandise is not calendars, but is properly found to be

---

[12] In French, this section reads "Calendriers de tous genres, imprimés, y compris les blocs de calendriers à effeuiller." See Organisation Mondiale des Douanes, Nomenclature du SH Édition 2017, 49.10, https://www.wcoomd.org/-/media/wco/public/fr/pdf/topics/nomenclature/instruments-and-tools/hs-nomenclature-2017/2017/1049_2017f.pdf?la=fr (last visited Apr. 4, 2024).

"similar articles" to those listed in subheading 4820.10.40.00, HTSUS. Gov. MSJ at 14. The Government supports this argument by asserting that the predominant use of the objects is not as calendars, and that the ENs support that the product should not be classified as a calendar. Gov. MSJ at 17–22. The Government further argues that the Federal Circuit's ruling in <u>Mead Corp. v. United States</u>, 283 F.3d 1342, 1349 (Fed. Cir. 2002) addressed a similar set of facts and classified the subject merchandise in that case as "[o]ther" paper products. Gov. MSJ at 23. The court begins its analysis under GRI 1.

> D. <u>Tariff Classification of the Paper Merchandise</u>

As a threshold matter, the court must determine whether the merchandise is properly classified under heading 4910, HTSUS, or heading 4820, HTSUS. Heading 4820, HTSUS, falls within Chapter 48 of the HTSUS, which is generally described as containing headings that classify "paper and paperboard; articles of paper pulp, of paper or of paperboard." Chapter 48, HTSUS (2020). Heading 4910, HTSUS falls within Chapter 49 of the HTSUS, which contains headings which classify "printed books, newspapers, pictures and other products of the printing industry; manuscripts, typescripts and plans." Chapter 49, HTSUS (2020). While Chapter 49 includes paper products where the printing provides the essential character of the articles, the ENs clarify that Chapter 48 is for other paper products that can be used to record various kinds of information. <u>Compare</u> EN 48.20 ("Some articles of this heading often contain a considerable amount of printed matter but remain classified in this heading (and not Chapter 49) <u>provided</u> that the printing is subsidiary to their primary use, for example . . . diaries (essentially for writing)."), <u>with</u> EN 49.10 ("This heading relates to calendars of any kind . . . <u>provided</u> that the printing gives the article its essential character.").

Blue Sky argues that these products are eo nomine calendars.  Blue Sky MSJ at 18.  The

Government argues that although the subject merchandise contains some limited printed calendar

pages the subject merchandise is not defined by those pages, but instead as a whole is defined by

space to record information.  Gov. MSJ at 21.  To begin the eo nomine analysis, the court looks to

the Oxford English Dictionary,[13]  which defines a calendar as:

> The system according to which the beginning and length of successive civil years, and the subdivision of the year into its parts, is fixed; as the Babylonian, Jewish, Roman, or Arabic calendar

> [or]

> A table showing the division of a given year into its months and days, and referring the days of each month to the days of the week; often also including important astronomical data, and indicating ecclesiastical or other festivals, and other events belonging to individual days. Sometimes containing only facts and dates belonging to a particular profession or pursuit, as Gardener's Calendar, Racing Calendar, etc. Also a series of tables, giving these facts more fully; an almanac

> [or]

> A contrivance for reckoning days, months, etc.[14]

Portions of the subject merchandise meet this definition, but the whole of each item of the subject

merchandise classified in this case exceeds Blue Sky's proffered eo nomine classification, as the

products are not merely charts for showing the division of a given year, but rather are bound

notebooks that contain charts that meet the calendar definition along with space to write

information about each day/month as well as space to write additional notes, addresses, and

---

[13] In order to support its argument, Blue Sky cites to the Oxford American Dictionary's definition of "calendar."  Blue Sky MSJ at 14.  The Government cites to several other definitions.  Gov. MSJ at 18.  At oral argument, Blue Sky confirmed that the court should look to British English to define the tariff terms.  As British English "calendar" is what informs the HTSUS, reference to the Oxford English Dictionary is appropriate.  See, e.g., Victoria's Secret, 37 CIT at 585–86, 908 F. Supp. 2d at 1345.

[14] Calendar, Oxford Eng. Dictionary, https://www.oed.com/dictionary/calendar_n?tl=true (last visited Mar. 21, 2024).

telephone numbers.  The subject merchandise in this case serves a consumer that not only wishes

to keep track of the days, but to make notations regarding them, and thus heading 4820, HTSUS,

not heading 4910, HTSUS, is the appropriate heading here, as the ENs further demonstrate.[15]

The EN associated with heading 4910, HTSUS clarifies that heading 4910, HTSUS "does
not cover articles whose essential character is not determined by the presence of a calendar" and
also excludes "[m]emorandum pads incorporating calendars and diaries (including so-called
engagement calendars) (heading 48.20)."[16]  EN 49.10.  The Cambridge Essential British English
dictionary defines a diary as either "a book in which you write about what you have done and your
thoughts and feelings," or "a book in which you write things that you must remember to do."[17]
The Oxford English Dictionary defines a diary as "[a] daily record of events or transactions, a
journal; specifically, a daily record of matters affecting the writer personally, or which come under
his or her personal observation" or "[a] book prepared for keeping a daily record, or having spaces
with printed dates for daily memoranda and jottings; also, applied to calendars containing daily
memoranda on matters of importance to people generally, or to members of a particular profession,

---

[15] Blue Sky argues that the ENs should be ignored here because they conflict with the unambiguous
language of heading 4910, HTSUS.  Blue Sky MSJ at 18.  There is a difference between a
"calendar" and a "book with a calendar," just as there is a difference between a "wheel" and a
"vehicle that moves by wheels."  The language of heading 4910, HTSUS, is neither so
unambiguous as applied here that reference to the ENs is inappropriate nor, when properly
understood, does the language of the EN conflict with the language of heading 4910, HTSUS.

[16] Blue Sky argues that because the paper products expire, this makes them calendars.  Blue Sky
MSJ at 18.  The Government responds that the ENs clarify that merely being "dated" does not
make an item a calendar.  Gov. MSJ at 19–20.  Reviewing the EN, it is clear that, even if portions
of the subject merchandise could be defined as calendars, not all items incorporating calendars are
covered by heading 4910's "calendars of any kind."  See EN 49.10.  Blue Sky's argument is
therefore not persuasive.

[17] Diary, Cambridge Dictionary, Essential British English, https://dictionary.cambridge.org
/dictionary/essential-british-english/diary (last visited Feb. 21, 2024).

occupation, or pursuit."[18]  These broad definitions recognize two different uses of the same word: diaries are both retrospective journals, and prospective scheduling devices.  Examining the subject merchandise in this case, it appears that the court is presented with a series of notebooks "in which you write things that you must remember to do."  The subject merchandise therefore appears to the court to be diaries, and thus properly excluded from heading 4910, HTSUS and properly classified within heading 4820, HTSUS.

      This conclusion is further supported by examination of the French SH text, which uses "agendas" in place of the English "diary."[19]  "Agendas" in French means "[r]egistre, carnet comportant un calendrier et dans lequel on inscrit pour chaque jour ce que l'on se propose de faire,"[20] or  "carnet de rendez-vous,"[21] which roughly translates as "registers, a notebook with a calendar and in which one writes for each day what one proposes to do" and "appointment book."[22]  Where, as here, the French and English texts may be read in agreement, "that construction which establishes this conformity ought to prevail."  Percheman, 32 U.S. at 52.

---

[18]  Diary, Oxford Eng. Dictionary, https://www.oed.com/dictionary/diary_n?tab=meaning_and_use#6942057 (last visited Mar. 18, 2024).

[19]  "Registres, livres comptables, carnets (de notes, de commandes, de quittances), blocs-mémorandums, blocs de papier à lettres, agendas et ouvrages similaires."  See Organisation Mondiale des Douanes, Nomenclature du SH Édition 2017, 48.20, https://www.wcoomd.org/-/media/wco/public/fr/pdf/topics/nomenclature/instruments-and-tools/hs-nomenclature-2017/2017/1048_2017f.pdf?la=fr (last visited Apr. 4, 2024).

[20]  Agenda, Dictionnaire de L'Academie Francaise, https://www.dictionnaire-academie.fr/article/A9A0834 (last visited Mar. 22, 2024).

[21]  Agenda, Cambridge French-English Dictionary, https://dictionary.cambridge.org/us/dictionary/french-english/agenda (last visited Mar. 22, 2024).

[22]  See Cambridge French–English Dictionary, https://dictionary.cambridge.org/dictionary/french-english/ (last visited Mar. 27, 2024).

Although perhaps of little interest to the parties, as the tariff does not differ, the court must select the proper classification, here at the eight-digit level.[23]   See GRI 6, HTSUS.   The Government agrees that the subject merchandise is excluded from heading 4910.00, HTSUS, by the EN and should be classified within heading 4820, HTSUS, but argues that the subject merchandise should be classified within subheading 4820.10.40.00, HTSUS, "[o]ther" paper products.  Gov. MSJ at 2.  Here, in order to classify this subject merchandise as "[o]ther," the court would have to decide that this subject merchandise is not, in fact, a diary.  The Government based its argument for the "[o]ther" classification on a prior ruling from the Federal Circuit, where a day planner had been classified as subheading 4820.10.40.00, HTSUS, "[o]ther."  See Mead, 283 F.3d at 1349; Blue Sky MSJ at Ex. 2, 42:12 to 43:7; Gov. MSJ at 23.  There, however, the subject merchandise at issue had many different components—it was

> a calendar, a section for daily notes, a section for telephone numbers and addresses, and a notepad . . . with additional items such as a daily planner section, plastic ruler, plastic pouch, credit card holder, and computer diskette holder. A loose-leaf ringed binder holds the contents of the day planner, except for the notepad, which fits into the rear flap of the day planner's outer cover.

Mead, 283 F.3d at 1344.  In that case, the court found that the items in question were neither diaries nor bound, which required classification as "[o]ther."  See id. at 1350.  Unlike in Mead, the notebooks here are clearly bound, and there is very little in them besides date pages for scheduling

---

[23] This classification dispute is past the six-digit level, but the meaning of the HS is still instructive at this level because the terms broken out at the eight-digit level come from the six-digit level of the HTSUS.  For example, subheading 4820.10, HTSUS, which reads "[r]egisters, account books, notebooks, order books, receipt books, letter pads, memorandum pads, diaries and similar articles," narrows to become subheading 4820.10.20, HTSUS, "[d]iaries, notebooks and address books, bound; memorandum pads, letter pads and similar articles."  Here, the dispute is between subheading 4820.10.20.10, HTSUS, "[d]iaries and address books" or subheading 4820.10.40.00, HTSUS, "[o]ther."  As the subheadings are merely more narrow divisions of tariff terms used at the six-digit level, it would be illogical to argue that "diary" should mean one thing at the six-digit level, and another at the eight-digit level, without some evidence of a Congressional intent to redefine the term.

purposes.[24]  What little additional content there is supports the scheduling function; a few pages

for notes, a page for goals, and a page for contacts.  As the products at issue are diaries, the correct

classification is 4820.10.20.10, HTSUS.  Accordingly, the Government's asserted basket

provision, "[o]ther," is rejected.

The obligation of the court, in interpreting the HTSUS, is to ensure that U.S. law reflects

"the nomenclature established internationally by the Convention," see 19 U.S.C. § 3001, unless

altered by Congress.  Reviewing the HS, the SH, multiple English and French definitions, and the

---

[24] Given the lack of discussion of the HS and the ENs in Mead the court need not rely on the narrow definition used there.  In Mead, the court was asked by the parties to determine whether the subject merchandise then before it met the definition of diary as the court and parties understood it from pre-HTSUS caselaw.  See Mead, 283 F.3d at 1346; see also, e.g., Baumgarten v. United States, 49 Cust. Ct. 275 (1962).  The subject merchandise now before the court is different from the subject merchandise that was before the court in Mead.  Further, in Mead no party raised the argument that the subject merchandise in that case was a calendar.  See Mead, 283 F.3d at 1347 ("Neither party in this case would classify the day planners as calendars.").  Because the parties did not raise this issue before the Mead court, the Mead court was not called upon to examine the EN associated with heading 4910, HTSUS.  See, e.g., Gerson Co. v. United States, 254 F. Supp. 3d 1271, 1277 (CIT 2017), aff'd, 898 F.3d 1232 (Fed. Cir. 2018).  Here, because of the arguments of the parties in this case, the court was required to analyze the ENs and finds that the EN for heading 4910, HTSUS, not raised in Mead, clarifies the meaning of "diary" within heading 4820, HTSUS.  The EN for heading 4910, HTSUS excludes "diaries (including so-called engagement calendars)."  EN 49.10.  An engagement calendar is not defined by the Oxford English Dictionary, and it appears to primarily be an American English term meaning "an appointment book for the daily recording of social engagements and other appointments."  Engagement Calendar, Collins Dictionary, https://www.collinsdictionary.com /us/dictionary/english/engagement-calendar (last visited Mar. 18, 2024); see also Engagement Calendar, Dictionary.com, https://www.dictionary.com/browse/engagement-calendar (last visited Mar. 18, 2024) ("[A]n appointment book for the daily recording of social engagements and other appointments").  As previously covered, in British English, a diary may be "a book in which you write things that you must remember to do."  See supra at n.17.  Thus, the terms "diary" and "engagement calendar" appear to be synonyms, one term in British English, and the other American English, both meaning a notebook used for scheduling purposes.  The EN's explanation that its exclusion of diaries includes "so-called engagement calendars" confirms that the word diary within the HTSUS is intended to capture both the retrospective definition of a diary and the prospective definition.  A diary may, as the Federal Circuit correctly identified, be a document for the retrospective record of events; but, reading the broader British definition and utilizing the ENs for guidance, today it is also "a book in which you write things that you must remember to do."

ENs, the court finds that "diary" includes "a book in which you write things that you must remember to do," and this particular subject merchandise is a "diary" as the term is used in the HTSUS. Customs' classification of this product under subheading 4820.10.40.00, HTSUS was incorrect and the subject merchandise should instead be classified as subheading 4820.10.20.10, HTSUS.

## CONCLUSION

For the foregoing reasons, the court grants in part Blue Sky's motion for summary judgment, denies Government's motion for summary judgment, and holds that the Government improperly classified the subject merchandise under subheading 4820.10.40.00, HTSUS. The subject merchandise is properly classified as "diaries" under subheading 4820.10.20.10, HTSUS. Judgment will be entered accordingly.

/s/ Jane A. Restani
Jane A. Restani, Judge

Dated: April 10,  2024
New York, New York